FILED
2014 Oct-31  PM 04:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KRISTOPHER FLETCHER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:11-cv-00056-MHH** |
| | } | |
| **SUPREME BEVERAGE** | } | |
| **COMPANY,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

In this employment discrimination action, Kristopher Fletcher claims that his former employer, Supreme Beverage Company or SBC, discriminated and retaliated against him on the basis of his race.  Mr. Fletcher is African-American. SBC has filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  The company argues that it is entitled to judgment as a matter of law on all of Mr. Fletcher's claims.[1]  Because Mr. Fletcher cannot establish a prima facie case for race discrimination or retaliation and because Mr. Fletcher's

---

[1] Mr. Fletcher concedes that he cannot establish his Title VII and Section 1981 discrimination and relation claims related to demotion or his state law claim for intentional infliction of emotional distress.  (*See* Doc. 20, p. 1, n. 3).  Because Mr. Fletcher has abandoned these claims, the Court does not address them in assessing the merits of SBC's summary judgment motion.

remaining state law claim fails as a matter of law, the Court grants SBC's motion for summary judgment.[2]

## I.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party opposing a motion for summary judgment must identify disputed issues of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party. *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

---

[2] As a threshold matter, SBC urges the Court to find that Mr. Fletcher's claims are barred by the doctrine of judicial estoppel. The Eleventh Circuit has explained that "[j]udicial estoppel is an equitable doctrine invoked at a court's discretion." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (citing *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)). The record reflects that Mr. Fletcher may have failed to disclose his pending EEOC charge or lawsuit against SBC in one of his two bankruptcy petitions, meaning Mr. Fletcher may be "precluded from asserting [] claim[s] in [this] legal proceeding that [are] inconsistent with a claim taken by" Mr. Fletcher in his bankruptcy proceedings. *Id.* (internal citation and quotation marks omitted). Nevertheless, because the Court finds that SBC is entitled to summary judgment on the merits on Mr. Fletcher's claims, the Court does not address whether SBC is entitled to summary judgment under the procedural bar of judicial estoppel.

## II.   RELEVANT FACTS[3]

### A.   Mr. Fletcher's Early Years with SBC

SBC is a wholesale beverage distributor.  SBC sells and delivers beer, Red Bull, and other beverages to restaurants and retail stores.  The company is based in Birmingham, Alabama.  It has five branches throughout Alabama.  (Doc. 18-19, ¶¶ 2, 25).

Mr. Fletcher is an African American male.  He graduated from the University of Alabama in 2004 with a degree in accounting.  (Doc. 18-1, p. 3). Shortly after Mr. Fletcher graduated, a temp agency placed him at SBC.  He was responsible for a number of SBC's bookkeeping tasks.  (Doc. 18-1, pp. 4-5).  Three months after the temp agency placed Mr. Fletcher at SBC, the company's comptroller, David Traweek, and its chief financial officer, James Hall, interviewed Mr. Fletcher and hired him as a payroll processor.  Mr. Fletcher earned $12.00 per hour.  (Doc. 18-1, pp. 4-5, 20-21; Doc. 18-19, ¶ 4; Doc. 18-18, Ex. 1).

As a payroll processor, Mr. Fletcher processed the weekly payroll, reconciled product receipts from suppliers, calculated monthly excise taxes paid to the State of Alabama ABC Board, and performed various other accounts payable and accounts receivable clerical duties.  (Doc. 18-19, ¶4).  Mr. Fletcher worked as a payroll processor from August 2004 until January 2006.  Initially, he reported to

---

[3] Unless otherwise noted, these facts are undisputed.

Mr. Traweek.  (Doc. 18-1, p. 5).  When Mr. Traweek left SBC in September 2004, Mr. Fletcher reported to the company's new comptroller, Robert Warnick.  (Doc. 18-1, p. 9; Doc. 18-13, p. 9).

On January 2, 2006, Mr. Hall and SBC's director of operations, Alan Tistle, offered Mr. Fletcher the position of human resources manager.  (Doc. 18-1, p. 6; Doc. 18-13, p. 28; Doc. 18-19, ¶ 5).  The position was a new one for the company. Before 2006, each department within the company handled its own human resources tasks.  The company created the position to centralize human resources responsibilities.  (Doc. 18-1, p. 7; Doc. 18-19, ¶ 5).

When he accepted the human resources manager position with SBC, Mr. Fletcher did not have previous experience or training in human resources.  (Doc. 18-1, p. 15; Doc. 18-19, ¶ 9). As human resources manager, Mr. Fletcher was responsible for completing new hire paperwork, coordinating drug tests and DOT physicals, implementing policies, and coordinating health insurance and 401(k) benefits.  (Doc. 18-1, pp. 7-9).  He also was responsible for payroll.  (Doc. 18-1, p. 6).

When he became the human resources manager, Mr. Fletcher initially reported to Mr. Tistle.  (Doc. 18-1, p. 7; Doc. 18-19, ¶ 5).  In September or October of 2006, Mr. Tistle told Mr. Fletcher that he (Mr. Fletcher) was doing well and would receive a raise.  (Doc. 18-1, p. 24).  In January 2007, Mr. Tistle retired from

SBC.  (Doc. 18-19, ¶ 7).  Mr. Fletcher transitioned from reporting to Mr. Tistle to reporting to Mr. Hall for human resources matters and to Mr. Warnick for finance/payroll matters. (Doc. 18-1, pp. 10, 12; Doc. 18-13, p. 29; Doc. 18-19, ¶ 7). When Mr. Tistle retired, SBC had not evaluated Mr. Fletcher's job performance or given him a raise.  (Doc. 18-1, p. 24; Doc. 18-19, ¶ 7).

### B.    Mr. Fletcher's Work as SBC's Human Resources Manager

Shortly after he became responsible for supervising Mr. Fletcher's work as SBC's human resources manager, Mr. Hall scheduled a meeting with Mr. Fletcher to discuss a variety of topics, including Mr. Fletcher's work habits and performance and Mr. Hall's management style.  (Doc. 18-1, pp. 12-13; Doc. 18-2, DX1; Doc. 18-19, ¶ 8; Doc. 18-19, Ex. 3).  During the January 29, 2007 meeting, Mr. Hall asked Mr. Fletcher to submit a plan of action for becoming a manager and leader of SBC's human resources department. (Doc. 18-1, pp. 13-14; Doc. 18-2, DX1; Doc. 18-19, ¶ 8; Doc. 18-19, Ex. 3).  Mr. Fletcher complied.  He created and submitted to Mr. Hall a status report on his existing projects and a plan of action for obtaining formal training as a human resources manager, updating the employee handbook, and drafting job descriptions.  (Doc. 18-1, pp. 15, 118; Doc. 18-2, DX2; Doc. 18-19, ¶ 8; Doc. 18-19, Ex. 4).

On March 3, 2007, Mr. Hall asked Mr. Fletcher via e-mail if he had completed job descriptions for everyone in the company, and if not, "to prepare

them." (Doc. 18-19, ¶ 11; Doc. 18-19, p. 17, Ex. 6).  On March 27, 2007, Mr. Hall e-mailed Mr. Warnick and Mr. Fletcher and told them he wanted to start holding regular meetings to discuss issues in the human resources department.  (Doc. 18-19, ¶ 12; Doc. 18-19, p. 18, Ex. 7).  Mr. Fletcher recalls only two such meetings— in March 2007 and April 2007.  (Doc. 18-1, p. 22).[4]

Mr. Hall provided Mr. Fletcher with an agenda for the March 2007 meeting. (Doc. 18-1, pp. 18; Doc. 18-2, DX 3; Doc. 18-19, ¶ 13; Doc. 18-19, Ex. 8).   The agenda essentially was a "to-do" list.  The agenda provided that by April 30, 2007, Mr. Fletcher must have "job descriptions for every employment category."  (Doc. 18-1, p. 18; Doc. 18-2, DX3; Doc. 18-19, ¶ 13; Doc. 18-19, Ex. 8).   The agenda also stated that Mr. Fletcher must begin "to take charge of the 401(k) administration duties."  The agenda included instructions associated with that task. (Doc. 18-1, p. 18; Doc. 18-2, DX3; Doc. 18-19, ¶ 13; Doc. 18-19, Ex. 8).  In the agenda, Mr. Hall instructed Mr. Fletcher to "[f]ollow up on our BISYS audit package" and to "[l]ocate at least five useful training classes that you want to attend between now and December 31st."  (Doc. 18-1, p. 18; Doc. 18-2, DX3; Doc. 18-19, ¶ 13; Doc. 18-19, Ex. 8).  Mr. Hall asked Mr. Fletcher to "[p]repare a training program for branch managers and office managers on the proper handling

---

[4] The record contains two agendas for meetings in March 2007 and April 2007.  (Doc. 23-3, PX 27; Doc. 23-4, PX 28).

of work-related injuries."  (Doc. 18-1, p. 18; Doc. 18-2, DX3; Doc. 18-19, ¶ 13; Doc. 18-19, Ex. 8).  Additionally, Mr. Hall set a May 31, 2007 deadline for Mr. Fletcher to "[r]eview every employee file for completeness and accuracy," and to organize those files in a specific manner.  (Doc. 18-1, p. 18; Doc. 18-2, DX3; Doc. 18-19, ¶ 13; Doc. 18-19, Ex. 8).

On April 12, 2007, Mr. Hall discovered that there were a number of incorrect items in the March 401(k) census data that Mr. Fletcher prepared.  Mr. Hall e-mailed Mr. Fletcher and instructed him to correct the errors and to advise Mr. Hall and Mr. Warnick via e-mail when he had done so.  (Doc. 18-19, ¶ 14; Doc. 18-19, Ex. 9).

On April 13, 2007, Mr. Hall met with Mr. Fletcher and gave him an updated agenda.  (Doc. 18-1, p. 20; Doc. 18-2, DX2; Doc. 18-19, ¶ 15; Doc. 18-19, Ex. 10). In the April 13, 2007 agenda, Mr. Hall added two items to Mr. Fletcher's list of responsibilities: (1) "Set the dates for the FIRST quarter safety meeting at each location and make certain that Johnny complies with these dates," and (2) "Clean and organize your office."  (Doc. 18-1, p. 20; Doc. 18-2, DX2; Doc. 18-19, ¶ 15; Doc. 18-19, Ex. 10).  Mr. Hall emailed the April 13, 2007 agenda to Mr. Fletcher on April 17, 2007.  In the email, Mr. Hall wrote:  "As we talked about in the meeting, please keep me posted on the status of each point on the agenda.  If something is already done, let me know that by responding to this email today or

tomorrow.  As for those things that aren't done yet, let me know when you think they will be done."  (Doc. 18-19, ¶ 16; Doc. 18-19, Ex. 11).

On May 24 and 25, 2007, with Mr. Hall's approval, Mr. Fletcher attended an HR Expert Class for ADP and a human resources seminar.  (Doc. 18-1, p.13; Doc. 18-19, ¶ 16).  In June or July 2007, Mr. Fletcher and Mr. Hall attended an OSHA class together.  (Doc. 18-19, ¶ 19; Doc. 18-19, Ex. 13).

On July 16, 2007, Mr. Hall sent Mr. Fletcher an e-mail and asked Mr. Fletcher to provide an "update [] on the projects in the [April 13, 2007 agenda]."  (Doc. 18-19, ¶ 19; Doc. 18-19, Ex. 13).  Later that day, Mr. Fletcher sent Mr. Hall an e-mail as requested and informed Mr. Hall that a number of items on the agenda still were not completed, including job descriptions, reviewing employee files for completeness, and setting the date for the second quarter safety meeting.  (Doc. 18-19, ¶ 19; Doc. 18-19, Ex. 14).

On July 30, 2007, Mr. Hall sent Mr. Fletcher an e-mail stating:  "Due to the recent turnover in the accounting department, I am going to take over the daily management of your area from Robert [Warnick] for the short term and maybe for the long term, too.  Any questions that you would have directed to him should now be directed to me. . . . I am also waiting on the . . . reports I requested from you week before last. . . . Finally, please update me on the job description project."  (Doc. 18-19, ¶ 20; Doc. 18-19, Ex. 15).  Later that day, Mr. Hall sent Mr. Fletcher

another e-mail stating, "I am also still waiting on the RBNA pay plan report that I asked for a month ago."  (Doc. 18-19, ¶ 21; Doc. 18-19, Ex. 16).

Also on July 30, 2007, Mr. Hall sent Mr. Fletcher an e-mail regarding a SBC employee who was interested in enrolling in the company's 401(k) plan.  (Doc. 18-19, ¶ 22; Doc. 18-19, Ex. 17).   Mr. Hall informed Mr. Fletcher that company records mistakenly listed the employee as terminated.  (Doc. 18-19, ¶ 22; Doc. 18-19, Ex. 17).   Mr. Hall asked Mr. Fletcher to reactivate that employee and to send the employee the 401(k) plan brochure.  (Doc. 18-19, ¶ 22; Doc. 18-19, Ex. 17). Mr. Hall also asked Mr. Fletcher to find out which employee should be terminated in the system and to correct the error.  (Doc. 18-19, ¶ 22; Doc. 18-19, Ex. 17).

During a review of SBC's July and August 2007 health insurance deductions, Mr. Hall discovered several ineligible employees who were insured under SBC's policy.  Mr. Hall maintains that as human resources manager, Mr. Fletcher was responsible for adding eligible employees to SBC's coverage and removing ineligible former employees from SBC's policy.  According to Mr. Hall, Mr. Fletcher did not review SBC's monthly Blue Cross/Blue Shield report accurately.  As a result, SBC paid a claim for an employee who resigned on March 2, 2007 who had not been removed from SBC's coverage.  (Doc. 18-19, ¶ 23).[5]

---

[5] Mr. Fletcher challenges these facts concerning his monitoring of SBC's insurance records. (Doc. 20, Plaintiff's brief in opposition to SBC's motion for summary judgment, pp. 9-10, ¶¶ 58-62).  Mr. Fletcher states that "the allegations . . . are undocumented by Defendant" and that his

Mr. Hall also maintains that in August 2007, SBC's Muscle Shoals office manager informed Mr. Hall that Mr. Fletcher failed to deduct properly the cost of Blue Cross/Blue Shield insurance from the monthly salary of one of SBC's employees over the course of 18 months. (Doc. 18-19, ¶ 23).

On August 2, 2007, Mr. Hall and Mr. Warnick met with Mr. Fletcher to review his first employee performance evaluation as the human resources manager. (Doc. 18-1, p. 24; Doc. 18-2, DX5; Doc. 18-19, ¶ 24; Doc. 18-19, Ex. 18). Mr. Hall explained that Mr. Fletcher was not "grasping HR as [SBC] would like him to." (Doc. 18-1, p. 26). The written evaluation states that Mr. Fletcher "performs payroll submission with minimal errors," but "has to be managed on a daily basis related to Human Resources assignments." (Doc. 18-2, DX5; Doc. 18-19, ¶ 24; Doc. 18-19, Ex. 18). According to the evaluation, Mr. Fletcher had to be "managed closely and followed up with for completion of assigned tasks," and "[t]he agenda assigned by James Hall (CFO) on March 30th, 2007 has not been fully completed." (Doc. 18-2, DX5; Doc. 18-19, ¶ 24; Doc. 18-19, Ex. 18). Mr. Fletcher admits that he did not complete the job descriptions list or update the

---

August 2, 2007 review does not include any information related to Blue Cross Blue Shield. (Doc. 20, pp. 9-10, ¶¶ 58-62). Mr. Fletcher is correct; his August 2, 2007 evaluation does not mention Blue Cross/Blue Shield (Doc. 21-21); however, the absence of documentation does not negate the assertions of fact in Mr. Hall's affidavit. Mr. Fletcher has offered no evidence – not even his own sworn testimony – to contradict the information contained in Mr. Hall's affidavit. Although the Court must review the evidence in the light most favorable to Mr. Fletcher, the Court cannot assume facts that are not in evidence. Mr. Fletcher has not identified a disputed issue of fact regarding this insurance issue.

employee files.   (Doc. 18-1, pp. 25-26; Doc. 18-19, ¶ 25).   Mr. Fletcher was "shocked and dumfounded" but did not offer a response to the remarks.   (Doc. 18-1, pp. 25-26).

During the meeting, Mr. Hall and Mr. Warnick offered to move Mr. Fletcher to an accounts receivable supervisor position.   (Doc. 18-1, pp. 25-26; Doc. 18-19, ¶ 25).   In that position, Mr. Fletcher would have been responsible for accounts receivable for SBC's Birmingham location and for payroll for all five SBC locations.   (Doc. 18-1, p. 30).   SBC maintains that although Mr. Fletcher's job duties would have decreased, his transfer would have been a lateral move within the company.   (Doc. 18-19, ¶ 25).   Mr. Fletcher testified that the move to accounts receivable would have been a "lateral" one in terms of pay, but Mr. Fletcher believed it was a demotion because of the loss of management status and responsibility.   (Doc. 18-1, p. 30).   SBC offered to pay Mr. Fletcher's benefits as part of the transfer.   (Doc. 18-1, pp. 30-31).

When offered the accounts receivable position, Mr. Fletcher testified that he "took it in consideration" but later changed his mind and told Mr. Hall and Mr. Warnick that he would rather stay in human resources and payroll. (Doc. 18-1, p. 28).   Mr. Fletcher told Mr. Hall and Mr. Warnick that he did not want the accounts receivable and payroll job because he did not want to have to "learn that [job] from scratch." (Doc. 18-1, p. 26).

On August 8, 2007, Mr. Warnick told Mr. Fletcher that SBC was going to move him to the accounting department the following day.  (Doc. 18-13, p. 39). In a letter to Mr. Warnick dated August 9, 2007, Mr. Fletcher resigned his position with SBC.  (Doc. 18-1, pp. 29-30; Doc. 18-2, DX6, p. SBC-FLETCHER-000066; Doc. 18-19, ¶ 27; Doc. 18-19, Ex. 19).  Mr. Fletcher's letter reads:  "As of August 9, 2007 I, Kristopher Fletcher, hereby resign my position with [SBC].  I really enjoyed the opportunities that were given to me over the years, but unfortunately I would like to venture out into new things with my career."  (Doc. 18-1, pp. 29-30; Doc. 18-2, DX6, p. SBC-FLETCHER-000066; Doc. 18-19, ¶ 27; Doc. 18-19, Ex. 19).[6]  Mr. Fletcher testified that he resigned instead of taking the accounts receivable job because "I had just purchased a house, and my – I purchased the house based on getting a raise, and the income I was going to be making, if I wasn't going to get a raise, I wouldn't be able to maintain the budgeted income that I had set forth for the house."  (Doc. 18-1, p. 31).  On August 15, 2007, Mr. Fletcher's last day of employment with SBC, he signed a COBRA notice stating, "[I] hereby resign my position with [SBC], as of the receipt of this document for the reason(s) listed below . . . . Reason(s) for Resignation: Personal."  (Doc. 18-1,

---

[6] Mr. Fletcher testified that he left the August 2, 2007 meeting with Mr. Hall and Mr. Warnick and typed a resignation letter in his office.  (Doc. 18-1, p. 29).  A copy of the resignation letter appears in the record.  (*See* Doc. 18-2, DX6).  The letter is dated August 9, 2007.  (*Id.*).  Mr. Fletcher points to no evidence in the record that contradicts Mr. Warnick's testimony that on August 8, 2007, he told Mr. Fletcher that he (Mr. Fletcher) would be moving back to the accounting department the following day.

p. 29; Doc. 18-2, DX6, p. SBC-FLETCHER-000065).  After Mr. Fletcher resigned, Mr. Hall took over Mr. Fletcher's human resources duties.  (Doc. 18-1, p. 57; Doc. 18-4, p. 4).

### C.    Mr. Fletcher's Role in Investigating Complaints of Discrimination

As human resources manager, Mr. Fletcher was responsible for reporting employee claims of discrimination or harassment to upper management.  (Doc. 18-1, p. 10; Doc. 18-19, ¶ 5).  Mr. Fletcher had no experience investigating complaints of discrimination, and he did not participate in any investigations associated with those complaints.  (Doc. 18-1, pp. 10, 54).  Mr. Fletcher was "limited on what [he] could do, because [he] didn't really know what [he] could do as far as investigating.  So all [he] could do is pass [complaints] along."  (Doc. 18-1, p. 35).

Mr. Fletcher received various complaints from a number of SBC employees, including James Collins, Ralph Ware, Freddie Gaines, Kenny Perry, Joe Winborn, Tony Dye, and Allen Trainer.  (Doc. 18-1, pp. 31-33).  Mr. Collins, a truck driver, complained that SBC was paying some of its white truck drivers more than SBC was paying him.  (Doc. 18-1, p. 32).  Mr. Ware complained that he had seniority over some of SBC's Caucasian Red Bull Supervisors, but SBC paid those supervisors more than they paid him.  (Doc. 18-1, p. 34).  Mr. Fletcher relayed the complaints from Mr. Collins and Mr. Ware to Mr. Tistle.  (Doc. 18-1, p. 33, 35, 37).

Mr. Gaines did not complain to Mr. Fletcher about discrimination but asked Mr. Fletcher, "When is the raise coming?"  (Doc. 18-1, p. 38).  Mr. Fletcher reported to Mr. Tistle "that there was another employee asking for a raise."  (Doc. 18-1, p. 38).

Mr. Perry complained that he had "a Class A license and a white driver ha[d] a Class B license and [was] making more than him, and how his routes were – He said he had the worst route compared to the white guys."  (Doc. 18-1, p. 38).  Mr. Fletcher relayed Mr. Perry's complaints to Mr. Tistle.  (Doc. 18-1, p. 39).

Mr. Winborn complained because Mike Windham had promised him a raise, and the raise "fell through."  (Doc. 18-1, p. 46).  Mr. Winborn also told Mr. Fletcher he was upset "about not being paid."  (Doc. 18-1, p. 46).  Mr. Fletcher asked Mr. Windham if he promised Mr. Winborn a raise.  (Doc. 18-1, p. 46).  Mr. Fletcher testified that Mr. Windham told him, "You go back to your office and handle yours up there."  (Doc. 18-1, p. 47).  Mr. Fletcher did not report Mr. Winborn's complaints to Mr. Tistle or Mr. Hall.  (Doc. 18-1, p. 47).

Mr. Dye complained "about not getting a raise."  (Doc. 18-1, p. 47).  When asked whether he reported the complaint to Mr. Tistle or Mr. Hall, Mr. Fletcher testified that sometimes Mr. Dye "would catch Tistle and I together and complain," but when Mr. Dye spoke to Mr. Tistle and Mr. Fletcher, he did not complain about "white guys getting paid more." (Doc. 18-1, p. 47).

Mr. Trainer complained that white drivers were getting better routes than African American drivers. (Doc. 18-1, p. 42). Mr. Fletcher reported Mr. Trainer's complaints to Mr. Tistle. (Doc. 18-1, p. 42). On June 1, 2007, Mr. Trainer submitted a letter to Mr. Fletcher stating that he (Mr. Trainer) felt that SBC was discriminating against him because of his race. (Doc. 18-1, pp. 44-45; Doc. 18-2, DX7).[7] Mr. Fletcher gave the letter to Mr. Hall and had no further involvement with the letter. (Doc. 18-1, pp. 45-46).

Mr. Fletcher testified that after "the letters with Trainer and stuff came in, that's when a lot of stuff started happening, as far as riding down on me and keeping me out of the loop more and more than what I was." (Doc. 18-1, pp. 54). Mr. Fletcher believes that Mr. Hall gave him the March and April 2007 agendas in retaliation for passing along other employees' complaints of unequal pay. (Doc. 18-1, p. 54).

---

[7] SBC terminated Mr. Trainer's employment on June 7, 2007 for "violation of policies/procedures." (Doc. 24-4, PX34). Mr. Trainer filed a lawsuit against SBC asserting Title VII and § 1981 claims for racial discrimination, harassment, and retaliation and state law claims for negligent hiring/supervision/training/retention and outrage. (*See* Doc. 1, *Trainer v. Supreme Beverage Co.*, 2:11-cv-00057-WMA). Judge Acker granted summary judgment in favor of SBC on all of Mr. Trainer's claims. (*See* Doc. 1, *Trainer v. Supreme Beverage Co.*, 2:11-cv-00057-WMA). Mr. Trainer has not appealed the summary judgment order entered on January 10, 2013. The Court takes judicial notice of the history Mr. Trainer's lawsuit. *See Horne v. Potter*, 392 Fed. Appx. 800, 802 (11th Cir. 2010) (district court properly took judicial notice of documents related to the plaintiff's previous civil action because the documents "were public records that were 'not subject to reasonable dispute' because they were 'capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned.'") (quoting Fed. R. Evid. 201(b); other internal citations omitted).

**D.     Mr. Fletcher's EEOC Charge**

On December 5, 2007, Mr. Fletcher filed a charge of discrimination with the EEOC.  (Doc. 18-1, p. 50; Doc. 18-2, DX9).  In his charge, Mr. Fletcher alleged that he was "discriminated against because of [his] race" and "retaliated against for engaging in a protected activity" in violation of Title VII. (Doc. 18-1, p. 197-198; Doc. 18-2, DX9).  Mr. Fletcher also asserted that when he was promoted to human resources manager in 2006, "Caucasian employees in lower level positions were paid more than me.  I asked for a pay increase but my requests were denied." (Doc. 18-1, p. 50; Doc. 18-2, DX9).  Mr. Fletcher reported that he was "constructively discharged and replaced with a Caucasian."  (Doc. 18-1, p. 50; Doc. 18-2, DX9).

On June 17, 2010, the EEOC issued a Letter of Determination and found both "cause" and "no cause." (Doc. 18-4, pp.54-55; Doc. 18-8, PX8).  The Letter of Determination states:

> Respondent denies that it discriminated against Charging Party. However, the evidence during the investigation establishes that there is reasonable cause to believe that a violation of the statute has occurred. Specifically, the evidence indicates that the Respondent began to scrutinize Charging Party's job performance in 2007 after he complained to the Respondent that he was making less money than the White sales managers. The evidence also indicates that Charging Party was not issued any disciplinary actions regarding his job performance during his employment with the Respondent. The evidence further indicates that Charging Party was denied a pay increase and his White supervisor asked him to vacate the human resource manager position and accept a position as the accounts receivable supervisor. The evidence revealed that Charging Party refused to accept the accounts receivable position and submitted his

16

resignation to the Respondent on August 9, 2007. Based on the
evidence of record, I have determined that there is reasonable cause to
believe that Charging Party was demoted and constructively
discharged in retaliation for engaging in a protected activity in
violation of Title VII. . . .

Based upon this investigation, however, EEOC is unable to conclude
that Charging Party was denied wages because of his race (Black) in
violation of Title VII . . . .

(Doc. 18-8, PX8).  The EEOC issued a Notice of Right to Sue on October 7, 2010.

(Doc. 18-1, p. 56; Doc. 18-2, DX11).

### E.    Allegations of Discriminatory Termination or "Constructive Discharge"

Mr. Fletcher's EEOC charge states that he was "constructively discharged

and replaced with a Caucasian."  (Doc. 18-1, p. 53).   During his deposition, Mr.

Fletcher testified that he voluntarily resigned.  (Doc. 18-1, p. 53).  Mr. Fletcher

testified that the conditions at SBC were not "so bad" but that he "was put in a

predicament" where he wanted to remain human resources manager "because that

was a good learning experience" but "it was also a scare tactic that, I was that

position, that I was going to be – that [Hall] was going to be on my back."  (Doc.

18-1, p. 53).

## IV.   DISCUSSION

### A.    Racial Discrimination Claims

Mr. Fletcher contends that SBC violated Title VII and § 1981 because the

company did not pay him at the same rate as Caucasian employees and because

17

SBC terminated his employment.  The Court analyzes Mr. Fletcher's Title VII and § 1981 race discrimination claims together under the same framework.  *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) ("This Circuit has routinely and systematically grouped Title VII and § 1981 claims for analytic purposes.") (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

A plaintiff may establish a claim of race discrimination through direct evidence, circumstantial evidence, or statistical proof.  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008).  Mr. Fletcher has offered circumstantial evidence of discrimination.[8]  Therefore, the Court evaluates his discrimination claims through the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  Under this scheme, the plaintiff first must establish by a preponderance of the evidence a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  A prima facie case requires "evidence adequate to create an inference that an employment action was based on a[n] [illegal] discriminatory criterion."  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977).  "By establishing a prima facie case, the plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against [him]."

---

[8] "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  *Standard*, 161 F.3d at 1330; *see also Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002) ("[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the [protected classification] are direct evidence of discrimination.") (internal quotations and citation omitted).

*E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002). If a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. *Rioux*, 520 F.3d at 1275. If the employer carries its burden of production, the presumption of discrimination is rebutted, and the plaintiff must show that the reason offered by the employer is a pretext for discrimination. *Id.* "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Joe's Stone Crabs*, 296 F.3d at 1273 (internal citations omitted).

### 1.    Discriminatory Pay

"To state a prima facie case for intentional discrimination in compensation, a plaintiff must establish that (1) [he] belongs to a protected racial minority; (2) [he] received low wages; (3) similarly situated comparators outside the protected class received higher wages; and (4) [he] was qualified to do the job." *Cooper v. Southern Co.*, 390 F.3d 695, 734-35 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006). Mr. Fletcher's Title VII and § 1981 claims for discriminatory pay fail because he cannot establish the third element of his prima facie case, namely that similarly situated employees outside of his protected class received higher wages.

To establish the third element of a discriminatory pay prima facie case, a plaintiff must demonstrate that he held a position "similar to that of a higher paid employee who is not a member of [his] protected class." *Crawford v. Carroll*, 529 F.3d 961, 974-75 (11th Cir. 2008) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)).   The employee or employees whom a plaintiff identifies a comparator "must be similarly situated in all relevant respects." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).   A "'comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.'" *Caraway v. Sec., U.S. Dept. of Transp.*, 550 Fed. Appx. 704, 709 (11th Cir. 2013) (citing *Wilson*, 376 F.3d at 1091).   The plaintiff's comparators must perform the same type of job tasks as the plaintiff. *Cooper*, 390 F.3d at 735.   Courts have looked to the length of employment and the type of expertise an individual has to determine whether the plaintiff has presented a valid comparator. *See Crawford*, 528 F.3d at 975.

In his deposition, Mr. Fletcher acknowledged that the only Caucasian employees in lower-level management positions who SBC paid a higher salary than him were the Red Bull supervisors.  (Doc. 18-1, p. 52).  The parties do not dispute that SBC paid the Red Bull supervisors a base salary of $40,000 per year, and SBC paid Mr. Fletcher a salary of $36,000 per year as human resources manager.  (Doc. 18-1, pp. 52-54).  Red Bull supervisors oversee the Red Bull

salesmen who are responsible for marketing, sales, and delivery of Red Bull product. (Doc. 18-19, ¶ 29).

The Red Bull supervisors are not valid comparators because they did not perform the same functions as Mr. Fletcher.  Mr. Fletcher admitted as much in his deposition.  (Doc. 18-1, p. 52).  Mr. Fletcher concedes that, "it is true that Red Bull supervisors, who were all Caucasian, do not perform the precise duties" that he performed as human resources director.  (Doc. 20, p. 35).  Mr. Fletcher argues that SBC has not justified its decision to pay him less than Red Bull supervisors when he was responsible for payroll and human resources duties.  (Doc. 20, p. 35).  In light of binding Eleventh Circuit precedent, Mr. Fletcher asks the wrong question. The Court must examine whether SBC paid similarly situated employees who performed nearly identical jobs different salaries.  The Red Bull supervisors are not similarly situated under the "nearly identical" standard.   *See e.g.*, *Hill v. Emory Univ.,* 346 Fed. Appx. 390 (11th Cir. 2009) (comparator was not similarly situated to plaintiff where plaintiff and comparator shared a job title, reported to the same supervisor, established and managed a budget, served as technical experts to clients, oversaw the administration of data, and supervised staff, but comparator had responsibilities that were different from the plaintiff's responsibilities); *Lee v. Mid-State Land & Timber Co.*, 285 Fed. Appx. 601, 606 (11th Cir. 2008) ("The plaintiff must show that he shared the same type of tasks as the comparators.").

21

Because Mr. Fletcher has presented no evidence to demonstrate that his responsibilities were nearly identical to the responsibilities of the Red Bull supervisors, he cannot establish that a similarly situated employee received higher wages.[9] Accordingly, Mr. Fletcher cannot make a prima facie showing of discriminatory compensation.

Mr. Fletcher attempts to overcome his lack of a valid comparator by relying upon Eleventh Circuit precedent that states that a plaintiff who has not identified a proper comparator may make a prima facie showing of discrimination via circumstantial evidence. *See Smith v. Lockheed-Martin*, 644 F.3d 1321 (11th Cir. 2011). In *Lockheed-Martin*, the Eleventh Circuit observed that, "the McDonnell Douglass framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment case." *Id.* at 1328. In the absence of a comparator, a plaintiff may withstand a summary judgment motion if he "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* Such a triable issue of fact

---

[9] In his opposition to SBC's summary judgment motion, Mr. Fletcher makes a passing reference to Suzie Bullock, an SBC accounts payable clerk who received a raise. (Doc. 20, pp. 35-36). Repeatedly in his deposition, Mr. Fletcher testified that the only Caucasian employees in lower-level positions who he believes were paid more than him were Red Bull supervisors. Even if the Court were to consider Ms. Bullock as a comparator, Mr. Fletcher's claim for pay discrimination would fail. Ms. Bullock was an accounts payable clerk when Mr. Fletcher served as human resources director. (Doc. 18-1, p. 25). Mr. Fletcher has offered no evidence that demonstrates that the job that Ms. Bullock performed was similar in any respect to his job as human resources manager. Therefore, on this record, Ms. Bullock is not a valid comparator for purposes of Mr. Fletcher's pay discrimination claim.

22

exists "if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).  In *Lockheed-Martin*, the plaintiff's circumstantial evidence consisted of "a documented history of disparate treatment of Caucasian and African-American employees, a spreadsheet listing the employees by name and race that the defendant's disciplinary review committee used to make discipline decisions, and a news program reporting the defendant's struggles with racism in the workplace."  *Davis v. Dunn Const. Co., Inc.*, 872 F. Supp. 2d 1291, 1312 (N.D. Ala. 2012) (discussing *Lockheed-Martin*, 644 F.3d at 1321).

Mr. Fletcher contends that "even without a precise comparator in the Human Resources Manager's position, the evidence which is presented by [him] creates a triable issue as to his claims of discrimination. . . ."  (Doc. 20, p. 39).  Mr. Fletcher maintains that the following constitutes a "convincing mosaic of circumstantial evidence":  evidence of (1) SBC management's hostility toward African American employees, (2) his heavy workload, (3) discrepancies between his salary and the salaries of Caucasian management employees, especially less experienced Red Bull supervisors, and (4) EEOC charges by five other African American SBC

employees who asserted charges of race discrimination and/or retaliation against SBC.  (Doc. 20, pp. 35-36, 39, 45).

Although Mr. Fletcher's legal theory may be sound, his evidence falls short. For example, Mr. Fletcher offers no context for his bald allegation that his workload was heavy.  Because Mr. Fletcher has not provided information about the workload of other SBC employees, particularly lower level management employees like him, the Court has no basis for comparison.  Standing by itself, Mr. Fletcher's workload sheds no light upon his allegation of intentional discrimination.  Likewise, the mere fact that SBC gave some Caucasian employees raises does not, without more, suggest that SBC acted in a discriminatory manner in setting Mr. Fletcher's salary.   Divorced from evidence concerning the similarities between job responsibilities and workloads, simple differences in pay do not "imply the presence of racial discrimination."  *See Bell v. Crowne Mgmt.*, LLC, 844 F. Supp. 2d 1222, 1236 (S.D. Ala. 2012) (because the plaintiff did not identify specific evidence about comparator conduct in presenting circumstantial evidence to prove his prima facie case, the court must grant summary judgment in favor of the defendant).  Finally, the EEOC charges that Mr. Fletcher cites are mere allegations.  These allegations are not sufficient to demonstrate that SBC had a history of discriminating against African Americans when the company set the

rates of compensation for its employees.[10]   In sum, the evidence presented by Mr.

Fletcher is not analogous to the extensive circumstantial evidence presented in

*Lockheed-Martin*.   Therefore, Mr. Fletcher has not identified a "convincing mosaic

of circumstantial evidence" that would enable him to survive SBC's summary

judgment motion.   *See, e.g.*, *Brown v. Berg Spiral Pipe Corp.*, 2011 WL 3610646,

at *15 (S.D. Ala. Aug. 17, 2011) (plaintiff's circumstantial evidence of two other

EEOC charges, the defendant's failure to follow its progressive discipline policy,

and the absence of disciplinary records in the personnel files of purported

comparators was not sufficient to demonstrate the *Lockheed-Martin* "convincing

mosaic").

        Therefore, the Court will enter summary judgment in favor of  SBC on Mr.

Fletcher's claims of discriminatory pay.

---

[10] The employees who filed the EEOC charges also sued SBC.  Judicial officers in this district
have dismissed Mr. Winborn's claims and Mr. Trainer's claims.  *See Winborn v. Supreme
Beverage Co., Inc.,* 2012 WL 5511014 (N.D. Ala., Nov. 8, 2012); *Trainer v. Supreme Beverage
Co., Inc.*, 2013 WL 169288 (N.D. Ala. Jan. 10, 2013).  Additionally, after the Court dismissed
every claim except one for discriminatory termination (not discriminatory pay), Mr. Ware and
SBC settled his legal action.  *See Ware v. Supreme Beverage Co., Inc.*, 927 F. Supp. 2d 1244
(N.D. Ala. 2013); Docs. 47, 48, 49 in Case No. 2:11-cv-00059-AKK.  Only Mr. Collins's
discriminatory termination claim survived SBC's summary judgment motion.  The parties settled
that claim.  *See* Doc. 83 in Case No. 2:11-cv-00058-AKK.  Mr. Gaines's case is pending before
the undersigned on SBC's motion for summary judgment.  *See* Doc. 20 in Case No. 2:12-cv-
00341-MHH.  Mr. Perry's case also is pending before the undersigned for review of the
presiding Magistrate Judge's report and recommendation regarding SBC's motion for summary
judgment.  *See* Docs. 17 and 42 in Case No. 2:11-cv-00060-MHH.  Court takes judicial notice of
these actions.  *See Horne*, 392 Fed. Appx. at 802.

## 2.    Discriminatory Termination

To establish a prima facie case of discriminatory termination, Mr. Fletcher must show "that he (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) his employer treated similarly situated employees outside his classification more favorably." *Ashmore v. Sec., Dept. of Transp.*, 503 Fed. Appx. 683, 687 (11th Cir. 2013) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

Mr. Fletcher's discriminatory termination claim rises and falls on his ability to establish an adverse employment action.  "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 587 (11th Cir. 2000) (quotation marks omitted), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006).

In his EEOC charge, Mr. Fletcher asserted that he was "constructively discharged."  (Doc. 18-2, p. 34; Doc. 20, pp. 39-42).  "A constructive discharge qualifies as an adverse employment action." *Menzie v. Ann Taylor Retail, Inc.*, 549 Fed. Appx. 891, 894 (11th Cir. 2013) (citing *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000)).  "To establish a constructive discharge, [Mr. Fletcher]

must show that 'working conditions were so intolerable that a reasonable person in [his] position would have been compelled to resign.'" *Id.* at 895-95 (quoting *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997)). "In evaluating constructive discharge claims, we do not consider the plaintiff's subjective feelings. Instead, we employ an objective standard." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (citing *Doe v. Dekalb Cnty. Sch. Dist.,* 145 F.3d 1441, 1450 (11th Cir. 1998)). In *Menzie*, the Eleventh Circuit explained that "[t]his objective standard sets a high threshold." 549 Fed. Appx. at 895. The Court stated:

> We have "required pervasive conduct by employers before finding that ... a constructive discharge occurred." *Hipp,* 252 F.3d at 1231; *see also Bryant v. Jones,* 575 F.3d 1281, 1289-90, 1298-99 (11th Cir. 2009) (holding that plaintiff established constructive discharge claim with evidence that her employer "was abusive . . . on numerous occasions, including an interaction where he appeared ready to assault [the plaintiff] physically" and severely restricted the plaintiff's responsibilities); *Poole,* 129 F.3d at 553 (holding that plaintiff submitted sufficient evidence to establish constructive discharge claim when she was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers").

*Id.* The Court must determine whether a reasonable juror could conclude that Mr. Fletcher's working conditions were so intolerable that he was compelled to resign.

Mr. Fletcher points to a number of facts that, in his view, support that conclusion. First, Mr. Fletcher contends that he was "bombarded with African-American employees complaining of discriminatory treatment by SBC" and that

these complaints "went unheeded and were not investigated." (Doc. 20, p. 41).

Mr. Fletcher overlooks the fact that as the human resources manager, he was

responsible for fielding complaints of discrimination and reporting those

complaints to upper management. Moreover, Mr. Fletcher testified that he did not

participate in investigations of complaints of discrimination because he was not

trained or equipped to do so. Therefore, he cannot fault SBC for failing to include

him in investigations.

Second, Mr. Fletcher asserts that after he began relaying complaints of racial

discrimination, Mr. Hall "began undermining his success and giving him too much

to do and refusing to evaluate him or give him a raise for the additional job

responsibilities." (Doc. 20, p. 41). The record contradicts this contention. The

tasks that Mr. Hall assigned to Mr. Fletcher in the March and April 2007 agendas

were part of Mr. Fletcher's job responsibilities as the human resources manager.

(Doc. 18-1, pp. 6-9). The record demonstrates that Mr. Fletcher did not ask Mr.

Hall for an evaluation until June or July 2007. (Doc. 18-1, p. 24). Mr. Hall and

Mr. Warnick evaluated Mr. Fletcher in August 2007. These undisputed facts do

not support Mr. Fletcher's constructive discharge claim. *See Beltrami v. Special

Counsel, Inc.*, 170 Fed. Appx. 61, 63 (11th Cir. 2006) ("Beltrami has failed to

show a disputed issue of material fact regarding whether he was constructively

discharged. His conditions were not objectively intolerable. Although he faced

several difficult tasks, he took no steps to attempt to meet them. Even if he were likely to be fired if he attempted to accomplish the tasks, he has not shown that he was being subjected to such intolerable conditions that he needed to quit immediately."); *see also Rowell v. BellSouth Corp.*, 433 F.3d 794, 806 (11th Cir. 2005) ("The fact that one of the possible outcomes is that he would lose his job alone is not sufficient to establish the intolerable conditions sufficient to justify a finding of constructive discharge. . . .").

Third, Mr. Fletcher claims that his August 2007 evaluation was not an evaluation but rather a threat to relieve him of his responsibilities as human resources manager.   (Doc. 20, p. 42).   The record indicates that Mr. Fletcher voluntarily resigned to "venture out into new things with [his] career" and to maintain the "budgeted income that [he] had set forth for [his new] house."  (Doc. 18-1, p. 29-31; Doc. 18-2, DX6).   When asked about his alleged constructive discharge, Mr. Fletcher testified:

Q.     . . . You voluntarily resigned, didn't you?

A.     Correct.

Q.     Okay.  Did you think that the conditions were so bad that they essentially forced you out when you resigned?

A.     Not so bad, but I was put in a predicament where I wanted to remain as Human Resources because that was a good learning experience for me, but I was also, like I said, it was a scare tactic, that if I was in that position, that I was going to be – that [Hall] was going to be on my back.

29

(Doc. 18-1, p. 53).

As discussed above, "difficult work objectives" are not sufficient to establish constructive discharge, even if the employer intends to fire the employee if he fails to meet those goals.  *See Beltrami*, 170 Fed. Appx. at 62.  On this record, the Court finds that Mr. Fletcher cannot establish a constructive discharge.  Because he cannot establish an adverse employment action, Mr. Fletcher's prima facie case for discriminatory termination fails.  Accordingly, the Court will enter summary judgment in favor of SBC on Mr. Fletcher's claim for discriminatory termination.

**B.     Racial Retaliation Claims**

As with Mr. Fletcher's claims for racial discrimination, the Court analyzes his retaliation claims under Title VII and Section 1981 together.  *See Worley v. City of Lilburn,* 408 Fed. Appx. 248, 250 (11th Cir. 2011) ("The elements required to establish retaliation claims under § 1981 are the same as those required for Title VII claims.").  Before reaching the merits of Mr. Fletcher's retaliation claims, the Court addresses SBC's contention that the Title VII retaliation claim is time barred because the allegations contained in Mr. Fletcher's complaint are beyond the scope of his EEOC charge.

Before a plaintiff files suit under Title VII, he must exhaust administrative remedies by filing a charge of discrimination with the EEOC.  *See* 42 U.S.C. §2000e-5(b).  Generally, a "plaintiff's judicial complaint is limited by the scope of

the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Georgia Dep't of Human Resources,* 355 F.3d 1277, 1280 (11th Cir. 2004) (quotations and citations omitted). "As long as allegations in the judicial complaint and proof are 'reasonably related' to charges in the administrative filing and 'no material differences' between them exists, the court will entertain them." *Wu v. Thomas,* 863 F.2d 1543, 1547 (11th Cir. 1989). "Judicial claims which serve to amplify, clarify, or more clearly focus earlier EEO complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate." *Id.*

The starting point for determining the permissible scope of a judicial complaint is the administrative charge and investigation. *Alexander,* 207 F.3d at 1332. Mr. Fletcher marked the box for "race" discrimination on his EEOC charge. (Doc. 18-2, p. 34, DX9). On the portion of the form labeled "The Particulars Are," Mr. Fletcher stated:

> I an [sic] African American and I was hired to work for the above named employer in 2002, as the payroll manager. In 2006 I was promoted to the human resources manager. Caucasian employees in lower level positions were paid more than me. I asked for a pay increase but my requests were denied. While I was performing the duties of human resources manager, I was also required to perform payroll duties. My supervisor, CFO James Hall, told me that if I remained in the position of human resources manager that he would expect more work from me. I was asked to step down from the position of human resource manager and start handling payroll and accounts receivable. I was constructively discharged and replaced with a Caucasian.

> I believe that I have been discriminated against because of my race, and retaliated against for engaging in a protected activity, in violation of Title VII of the Civil Rights Act of 1964.

(Doc. 18-2, p. 34, DX9).

The EEOC's letter of determination stated the following regarding the investigation:

> Specifically, the evidence indicates that that [SBC] began to scrutinize [Plaintiff's] job performance in 2007 after he complained to [SBC] that he was making less money than the White sales managers. The evidence also indicates that [Plaintiff] was not issued any disciplinary actions regarding his job performance during his employment with [SBC]. The evidence further indicates that [Plaintiff] was denied a pay increase and his White supervisor asked him to vacate the human resource manager position and accept a position as the accounts receivable supervisor. The evidence revealed that [Plaintiff] refused to accept the accounts receivable position and submitted his resignation to [SBC] on August 9, 2007. Based on the evidence of record, I have determined that there is reasonable cause to believe that [Plaintiff] was demoted and constructively discharged in retaliation for engaging in a protected activity. . . .

(Doc. 18-3, p. 17, PX1).

In his complaint, Mr. Fletcher did not allege that SBC removed him from his human resources manager position because he complained about being paid less than Caucasian employees.[11]   Rather, in his complaint, Mr. Fletcher alleges that

---

[11]  In fact, Mr. Fletcher testified that he did not complain to upper management about any disparity in his pay.  (Doc. 18-1, p. 55).  Mr. Fletcher testified that he believed he was retaliated against because he "was pressing them on giving [him] an evaluation so that [he] could get a raise."  (Doc. 18-1, p. 55).

SBC demoted him because he relayed other employees' complaints of discrimination to upper management:

> On or about June 7, 2007, African American employee, Alan Trainer, complained to Plaintiff verbally and in writing that he was being discriminated against because of his race. Plaintiff informed CFO, James Hall, and President, Mike Schellaci, about Plaintiff's complaints of racial discrimination and provided them with a copy of Plaintiff's written complaint. Hall and Schellaci informed Plaintiff that they would handle Trainer's complaints of racial discrimination.
>
> Approximately one month after Plaintiff reported Alan Trainer's complaints of racial discrimination to Hall and Schellaci he was removed from the Human Resources Manager position and placed in Accounts Receivable and Payroll departments. James Hall informed Plaintiff that he would be taking over the duties of Human Resources Manager. Plaintiff was demoted because of complaints of discrimination by other employees against Defendant, and because he engaged in protected activity.

(Doc. 1, ¶¶ 15-16).

Ordinarily, the Court might be inclined to grant summary judgment on Mr. Fletcher's Title VII retaliation claims because the allegations that appear in Mr. Fletcher's complaint, as compared to his EEOC charge, appear to be "new acts of discrimination, offered as the essential basis for the requested judicial review." *Wu*, 863 F.2d at 1547 at 1547 (citations omitted). The Court is mindful, though, that it should be "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]" and that it should not strictly interpret the charge. *Gregory*, 355 F.3d at 1280 (citations and quotations omitted). Moreover, granting summary judgment on this procedural issue does not offer the Court an opportunity

to resolve the claim efficiently because the Court must evaluate Mr. Fletcher's §
1981 retaliation claim even if the Court dismisses his Title VII retaliation claim.
Therefore, the Court examines the merits of Mr. Fletcher's Title VII claim.

To establish a prima facie case for retaliation, a plaintiff must show that: (1)
he engaged in statutorily protected activity, (2) he suffered a materially adverse
action, and (3) there was a causal connection between the protected activity and the
materially adverse action. *Howard v. Walgreen Co.,* 605 F.3d 1239, 1244 (11th
Cir. 2010). If a plaintiff establishes a prima facie case, the employer must
articulate a legitimate reason for the adverse employment action. *Davis v.
Postmaster General*, 550 Fed. Appx. 777, 779 (11th Cir. 2013) (citing *Holifield*,
115 F.3d at 1567). If the employer meets this burden, "the burden shifts back to
the plaintiff to show that the proffered explanation is a pretext for retaliation." *Id.*
SBC argues that Mr. Fletcher's retaliation claim fails because Mr. Fletcher did not
engage in protected activity. The Court agrees.[12]

"Under Title VII, an employee has engaged in protected activity if she has:
(1) opposed an unlawful employment practice, or (2) made a charge, testified,
assisted, or participated in any manner in an investigation, proceeding, or hearing
under Title VII's retaliation provision." *Smith v. City of Fort Pierce, Florida,* 565

---

[12] SBC also contends that Mr. Fletcher cannot demonstrate that SBC subjected him to an adverse
action or that there was a causal connection between any purported activity and the adverse
action. Because the Court finds that Mr. Fletcher did not engage in protected activity, the Court
does not reach these arguments.

Fed. Appx. 774, 777 (11th Cir. 2014) (internal quotations and citations omitted). Mr. Fletcher concedes that he is not entitled to protection based on his participation in the investigation of an unlawful employment practice. (Doc. 20, p. 47). The record also demonstrates that Mr. Fletcher did not oppose unlawful conduct because he did not complain that SBC unlawfully discriminated against him by paying him less money because of his race. (Doc. 18-1, p. 55). Mr. Fletcher's deposition testimony bears out this point:

> Q.    . . . Did you make any complaints to them that you thought that whites were getting pay raises and you weren't?
>
> A.    No.
>
> Q.    When you talked to them about the pay raise, Mr. Tistle and Mr. Hall about getting pay raises, did you ever bring up the fact that you felt that you were being discriminated against on pay?
>
> A.    No.  That wasn't the case with Tistle because he had already given me my recognition on my work, the work that I've performed, and said, "Good job, and we'll evaluated you at the start of the year," and I never mentioned anything to Hall.
>
> Q.    You never mentioned anything to Hall?
>
> A.    No.
>
> Q.    And what about Mr. Warnick?
>
> A.    No.

(Doc. 18-1, p. 55).[13]

At the most, Mr. Fletcher passed to upper management information about complaints of racial discrimination from lower level SBC employees.  (Doc. 20, pp. 47-49).  The Eleventh Circuit Court of Appeal's decision in *Brush v. Sears Holdings Corp.* forecloses Mr. Fletcher's argument that this conduct constitutes protected activity.  466 Fed. Appx. 781 (11th Cir. 2012).  In *Brush*, the plaintiff worked for Sears as a loss prevention district coach.  Sears asked her to meet with an employee to investigate the employee's claims of sexual harassment.  *Brush*, 466 Fed. Appx. at 783-84.  The employee told the plaintiff that her supervisor had raped her.  The plaintiff urged Sears to contact the sheriff's office.  Sears declined.  *Id.* at 784.  The plaintiff "continued to urge the reporting of the alleged rape."  *Id.* A short time later, Sears terminated the plaintiff's employment.  According to Sears, the plaintiff violated the company's policy "relating to the investigation of sexual harassment claims."  *Id.*  The plaintiff filed an EEOC charge.  In it, she

---

[13] *See Murphy v. City of Aventura*, 383 Fed. Appx. 915, 918 (11th Cir. 2010) ("'A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination.'") (quoting EEOC Compl. Man. (CCH) §§ 8-II-B(2) (2006)); *see also Demers v. Adams Homes of N.W. Fla., Inc.*, 321 Fed. Appx. 847, 852 (11th Cir. 2009) ("[T]o engage in protected activity, the employee must still, at the very least, communicate [his] belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred.") (internal quotations and citation omitted); *Brown v. City of Opelika*, 211 Fed. Appx. 862, 863-64 (11th Cir. 2006) (per curiam) (plaintiff did not engage in protected activity because she did not use the word "race" when she complained to supervisors, and the plaintiff "never voiced a complaint that the City was engaged in an unlawful employment practice.").

claimed that Sears fired her for "her opposition to the nature and performance of the [sexual harassment] investigation." *Id.* (internal quotations omitted). In her subsequent complaint, the plaintiff alleged that Sears retaliated against her "because of her participation in the investigation and her opposition to the way Sears was conducting the investigation." *Id.* (internal quotations omitted).

On appeal, the Eleventh Circuit affirmed the district court's finding that the plaintiff could not establish a prima facie case of retaliation. The Court stated: "[The plaintiff's] case rests upon her belief that her opposition to rape and Sears' handling of [an employee's] allegations are actionable under Title VII." *Id.* at 785. The Court concluded that the plaintiff's "disagreement with the way in which Sears conducted its internal investigation" did not evidence the plaintiff's "opposition to any unlawful practice" under Title VII. *Id.* at 786. The Court noted that the plaintiff "was neither the aggrieved nor the accused party in the underlying allegations. Instead, she was one of the [] employees tasked with conducting the internal investigation." *Id.* The Court rejected the plaintiff's argument that "an investigative manager's role in reporting a Title VII violation necessarily qualifies as a protected activity relating to a discriminatory practice." *Id.* (internal quotations omitted). In support of its holding, the Court cited with approval the "manager rule" endorsed by the Fifth and Tenth Circuits:

> In essence, the 'manager rule' holds that a management employee that, in the course of her normal job performance, disagrees with or

opposes the actions of an employer does not engage in 'protected activity.' *See McKenzie v. Renberg's Inc.,* 94 F.3d 1478 (10th Cir. 1996); *Hagan v. Echostar Satellite, L.L.C.,* 529 F.3d 617 (5th Cir. 2008) (same). Instead, to qualify as 'protected activity' an employee must cross the line from being an employee 'performing her job . . . to an employee lodging a personal complaint.' *McKenzie,* 94 F.3d at 1486. While Brush argues that *Crawford* has foreclosed the 'manager rule,' we cannot agree. *Crawford* pertained only to whether the reporting of a harassment claim was covered by Title VII where the reporting was solicited rather than volunteered. *Crawford,* 555 U.S. at 277–78, 129 S.Ct. 846. It did not address whether a disinterested party to a harassment claim could use that harassment claim as its own basis for a Title VII action. Accordingly, we find the 'manager rule' persuasive and a viable prohibition against certain individuals recovering under Title VII.

*Id.* at 787.

Unlike the plaintiff in *Brush*, Mr. Fletcher was not tasked with investigating other employees' complaints of discrimination; however, Mr. Fletcher was a management employee responsible for reporting employee complaints of discrimination to upper management, and he, in fact, relayed other employees' complaints of discrimination to Mr. Thistle and Mr. Hall. *See* pp. 13-15, *supra*. Therefore, Mr. Fletcher did not did not engage in protected activity because he did not lodge a personal complaint about racial discrimination at SBC.[14]  *See Brush*; *see also Dunn v. Wal-Mart Stores East, L.P.*, 2013 WL 1455326 (S.D. Fla. April 9, 2013) (applying *Brush*'s reasoning and the "manager rule" to conclude that that

---

[14] While serving as human resources manager, Mr. Fletcher saw employee pay raises and observed "the relative difference between the white and black pay."    (Doc. 18-1, pp. 55, 64). Mr. Fletcher concedes that he did not complain to Mr. Tistle or Mr. Hall about alleged disparities in compensation.

plaintiff failed to demonstrate that she engaged in protected activity "when she reported [] alleged discriminatory actions as part of her job responsibilities"). Accordingly, the Court will enter summary judgment in favor of SBC on Mr. Fletcher's Title VII and § 1981 retaliation claims.

### C.    State Law Claims

SBC is entitled to summary judgment on Mr. Fletcher's state law claims for negligent hiring, supervision, training, and negligent retention.   Under Alabama law, "[a] party alleging negligent or wanton hiring, supervision, training, and retention must prove the underlying wrongful conduct of employees."   *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1196 (Ala. 2008) ("[A] party alleging negligent supervision and hiring must prove the underlying wrongful conduct of the defendant's agents" (internal citations omitted)).   In addition, the underlying wrongful conduct must constitute "'a common-law Alabama tort' committed by the employee, not [] a federal cause of action such as Title VII." *Ellis v. Advanced Tech. Servs.*, 2010 WL 3526169, at *2 (M.D. Ala. Sept. 3, 2010) (quoting *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002)); *see also Rabb v. Georgia Pacific, LLC*, 2010 WL 2985575, at *16 (S.D. Ala. July 26, 2010) ("Because Alabama does not recognize a common-law tort for race discrimination in employment, this Court finds that [the plaintiff] cannot maintain an action for negligent supervision based on conduct that is

employment discrimination, but does not support a common law tort.") (internal quotations and citations omitted); *Beasley v. Wal-Mart Stores, East*, 2006 WL 3449144, *13 (S.D. Ala. Nov. 29, 2006) (employee could not maintain negligent supervision claim based upon sexual harassment claim).

Other than his negligent hiring, training, and supervision claim, Mr. Fletcher asserted only one common law tort claim, namely a claim for outrage.   Mr. Fletcher has abandoned this claim. *See supra*, note 1.   Absent an underlying Alabama state law tort claim, Mr. Fletcher cannot maintain his claims for negligent hiring, supervision, training, and negligent retention.   Accordingly, the Court will enter summary judgment in favor of SBC on Mr. Fletcher's claims for negligent hiring, supervision, training, and negligent retention.

## V.   CONCLUSION

For the reasons stated above, the Court **GRANTS** summary judgment in favor of SBC on all of Mr. Fletcher's claims.   The Court **DENIES** Mr. Fletcher's motion for leave to file a response to SBC's supplemental brief.  (Doc. 43).   The Court will enter a separate order consistent with this memorandum opinion dismissing this action with prejudice.

**DONE** and **ORDERED** this October 31, 2014.

_Madeline H. Haikala_
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

40